[No. 15163-8-III.   Division Three.   August 5, 1997.]

THE STATE OF WASHINGTON, *Appellant*, v. DONALD RAY BUCHANAN, *Respondent*.

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Kenneth L. Ramm, Jr., Deputy*, for appellant.

*David S. Vogel* and *Law Offices of David S. Vogel*, for respondent.

SCHULTHEIS, A.C.J. — The Nooksack Indian Tribe is restricted by an 1855 treaty to hunting "open and unclaimed" lands in the Washington Territory. Donald Buchanan, a Nooksack tribal member, was charged by information with possessing two elk out of season and hunting in a wildlife area without a valid license. The Yakima County Superior Court dismissed the charges on the basis that he had a treaty right to hunt in the wildlife area. On appeal, the State contends the Nooksack tribe has no right to hunt outside their usual and customary hunting grounds, the wildlife area is not "open and unclaimed" pursuant to the 1855 treaty, and Washington's admission to the Union after ratification of the treaty abrogated the treaty. We affirm.

In January 1995, Mr. Buchanan, his brother and his uncle—all Nooksack tribe members—were discovered by Department of Fisheries and Wildlife (DFW) officers with two five-point elk. The hunters had killed the elk in the Oak Creek Wildlife Area, owned by the Washington Department of Natural Resources (DNR). By state law, elk hunting in the Oak Creek area was closed at this time. When the season was open earlier in the fall, a special permit was required to kill anything older than a "spike bull."

In response to the DFW officers' questions, Mr. Buchanan and his relatives displayed their identification and elk tags issued by the Nooksack tribe. Mr. Buchanan did not have a valid Washington hunting license due to a prior elk hunting violation. Although the hunters claimed they could hunt anywhere in the state, the DFW officers understood that the Nooksack tribe had no treaty rights east of the Cascade Mountains. The officers impounded the elk as evidence and cited the hunters. Mr. Buchanan was charged by information with two counts of possession

of big game during a closed season[1] and one count of hunting while licensed revoked.[2]

Mr. Buchanan moved for dismissal of the charges on the ground that he was lawfully exercising his subsistence hunting rights under the Point Elliott Treaty of 1855. At the hearing on the motion in August 1995, the State argued that treaty rights were limited to land ceded by the tribe and to "normal and accustomed" hunting grounds. Additionally, the State asserted Mr. Buchanan had violated Nooksack tribal regulations and state hunting regulations that were applicable to treaty hunters. The superior court judge dismissed the charges. This appeal followed.

None of the facts related above are in dispute; what is disputed is the trial court's conclusion, as a matter of law, that Mr. Buchanan had a treaty right to hunt in the Oak Creek Wildlife Area. The State first argues the treaty reserved hunting rights only on land ceded by the tribe, originally "owned" by the tribe, or on a traditional tribal hunting ground.

A treaty between the United States and an Indian tribe is essentially a contract between sovereign nations. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S. Ct. 3055, 61 L. Ed. 2d 823, *modified on other grounds sub nom. Washington v. United States*, 444 U.S. 816, 100 S. Ct. 34, 62 L. Ed. 2d 24 (1979). Ambiguous treaty language must be resolved in favor of the Indians. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S. Ct. 1328, 25 L. Ed. 2d 615 (1970); *Department of Ecology v. Yakima Reservation Irrig. Dist.*, 121 Wn.2d 257, 277, 850 P.2d 1306 (1993). Further, treaty language must be construed, not according to its technical legal meaning, but in the sense that would

---

[1] RCW 77.16.020(1); 77.21.010(1) (second or subsequent violation). This is a class C felony with a maximum penalty of five years and/or a fine of $10,000. RCW 9A.20.021.

[2] RCW 77.21.060(2). This is a misdemeanor with a maximum penalty of 90 days and/or a fine of $500. RCW 77.21.010(2).

naturally be understood by the Indians. *Passenger Fishing Vessel*, 443 U.S. at 676.

In the Point Elliott Treaty of 1855, many western Washington tribes, including the Nooksack,[3] ceded land from the Puget Sound area to the western summit of the Cascade Mountain range. In return, the United States government in Article 5 of the treaty secured the tribes' rights of "taking fish at usual and accustomed grounds and stations . . . together with the privilege of hunting and gathering roots and berries on open and unclaimed lands." The Oak Creek Wildlife Area lies east of the Cascades, outside the ceded land.

■ Contrary to the State's argument, the Point Elliott treaty, by its express terms, does not limit hunting rights to the ceded lands or to traditional hunting grounds. Although fishing is reserved only on "usual and accustomed grounds and stations," hunting rights extend anywhere in the territory that is "open and unclaimed." Cases cited by the State are inapposite. In *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 105 S. Ct. 3420, 87 L. Ed. 2d 542 (1985), for example, the Supreme Court dismissed a tribe's assertion that it was entitled to hunt and fish on ceded lands. The treaty in question reserved no rights to hunt or fish outside the reservation. *Id.* at 755. The Point Elliott treaty, in contrast, specifically reserves such rights. In *United States v. Washington*, 384 F. Supp. 312, 331 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975), *vacated on other grounds sub nom. Passenger Fishing Vessel*, 443 U.S. 658, the court construes language similar to that found in the Point Elliott treaty: the "right of taking fish, at all usual and accustomed grounds and stations . . . . ." Any interpretation of that language requires a delineation of the traditional fishing grounds. A reservation of the right to hunt all "open and unclaimed" lands,

---

[3]Although the Nooksack are not mentioned by name in the treaty, it has been established that the treaty pertains to them. *United States v. Washington*, 459 F. Supp. 1020, 1041 (W.D. Wash. 1978).

however, clearly does not limit hunting to such traditional areas.[4]

■ This leads us to the interpretation of "open and unclaimed" lands within the meaning of the treaty. The State contends the Oak Creek Wildlife Area is no longer open and unclaimed because it is owned by the government and operated in the winter for purposes inconsistent with hunting, citing *United States v. Hicks*, 587 F. Supp. 1162, 1165-66 (W.D. Wash. 1984).

Several courts, including Washington's, have determined that national park lands are open and unclaimed within the meaning of treaties similar to Point Elliott. *See, e.g., Confederated Tribes v. Maison*, 262 F. Supp. 871, 873 (D. Or. 1966), *aff'd sub nom. Holcomb v. Confederated Tribes*, 382 F.2d 1013 (9th Cir. 1967); *State v. Miller*, 102 Wn.2d 678, 680 n.2, 689 P.2d 81 (1984); *State v. Chambers*, 81 Wn.2d 929, 506 P.2d 311 (1973). Such public lands, unoccupied by settlers, are open and unclaimed insofar as they are put to uses consistent with Indian hunting privileges. *Hicks*, 587 F. Supp. at 1165.

The Olympic National Park, subject of the *Hicks* decision, was permanently closed to elk hunting due to the government's interest in protecting endangered Roosevelt elk populations. As such, the park's purpose was inconsistent with Indian hunting rights and therefore could not be considered open and unclaimed land. *Hicks*, 587 F. Supp. at 1166. Here, however, the Oak Creek Wildlife Area is open to elk hunting periodically, so it passes the threshold test of open and unclaimed land under the treaty.

■ Even so, Nooksack hunting rights under the treaty are not unlimited. Although the United States Supreme Court has construed treaty rights broadly, protecting

---

[4]*Strong v. United States*, 518 F.2d 556 (Ct. Cl. 1975) is cited by the State to support its contention that a tribal member must prove aboriginal title, i.e., actual, exclusive and continuous use of the land for a long time. *Strong*, however, is a court of claims case wherein the Delaware and Shawnee tribes demanded compensation for lands they claimed they relinquished in eighteenth-century treaties. Aboriginal title had to be proven in order to support the claims.

Indians from encroachment by state governments, the Court has also recognized a state's power to regulate game within its borders. *Miller*, 102 Wn.2d at 681-82 (citing *Menominee Tribe v. United States*, 391 U.S. 404, 88 S. Ct. 1705, 20 L. Ed. 2d 697 (1968); *Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 391, 98 S. Ct. 1852, 56 L. Ed. 2d 354 (1978); *Antoine v. Washington*, 420 U.S. 194, 206-07, 95 S. Ct. 944, 43 L. Ed. 2d 129 (1975)). State wildlife regulations are applicable to the tribes as long as the regulations meet certain tests: the State has the affirmative burden of proving (1) the regulations are *reasonable* and *necessary* for conservation purposes, and (2) their application to Indians covered by the treaty is necessary for conservation. *Miller*, 102 Wn.2d at 687. Within this context, a "necessary" regulation is one required for the perpetuation of a species of game within a certain zone. *Id.* at 687-88. "A regulation is reasonable if it is appropriate to its conservation purpose." *Id.* at 688.

As the trial court properly found here, the State did not meet its burden of showing that the Oak Creek elk hunting regulations were necessary as applied to the Nooksack tribe. The State did not assign error to the court's findings that the tribe consists of no more than 450 individuals, yet over 30,000 non-tribal hunters are licensed to hunt in the Yakima area. No evidence was produced to show the number of elk killed by tribal hunting or to show any impact of the tribe's subsistence and ceremonial hunting[5] on the Oak Creek elk population. A DFW wildlife biologist testified that although recent restrictions on hunting mature males were designed to increase the number of bulls, there were no immediate threats to the elk population.

■ On balance, the State failed to show that it was necessary to apply the licensing restrictions to the Nooksack

[5]Nooksack tribal regulations restrict elk hunting to subsistence and ceremonial needs, one per day and four elk per family each year. The State does not contend on appeal that Mr. Buchanan violated the tribal hunting regulations.

tribe in order to perpetuate the Oak Creek elk population. Evidence offered on appeal, that a winter feeding station in the area is necessary to protect the elk, was not presented at trial and is not properly before this court. *Nelson v. McGoldrick*, 127 Wn.2d 124, 141, 896 P.2d 1258 (1995). At any rate, this evidence does not establish that the closure to hunting by the Nooksacks is necessary to perpetuate the species.

In its final argument, the State contends the Point Elliott treaty was abrogated by Washington's subsequent admission to the Union. This argument was not presented to the trial court, is not asserted to be of constitutional magnitude, and is not considered on appeal. *Richmond v. Thompson*, 130 Wn.2d 368, 384, 922 P.2d 1343 (1996). In any event, it is settled that Washington's admission into the Union imposed on the state, "equally with other states, the obligation to observe and carry out the provisions of treaties of the United States." *United States v. Washington*, 384 F. Supp. 312, 401 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975), *vacated on other grounds sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S. Ct. 3055, 61 L. Ed. 2d 823, *modified on other grounds sub nom. Washington v. United States*, 444 U.S. 816, 100 S. Ct. 34, 62 L. Ed. 2d 24 (1979).

Affirmed.

THOMPSON and KURTZ, JJ., concur.

Reconsideration denied September 2, 1997.

Review granted at 134 Wn.2d 1012 (1998).